PATRIOT EXPLORATION, LLC; Jonathan Feldman; Redwing Drilling Partners; Mapleleaf Drilling Partners; Avalanche Drilling Partners; Penguin Drilling Partners; and: Gramax Insurance Co. Ltd., Plaintiffs,

v.

SANDRIDGE ENERGY, INC.; SandRidge Exploration and Production, LLC; Tom L. Ward; Matthew K. Grubb; Rodney E. Johnson; Everett R. Dobson; William A. Gilliland; Daniel W. Jordan; Roy T. Oliver; and Jeffrey S. Serota, Defendants.

Civil No. 3:11cv01234(AWT).

United States District Court, D. Connecticut.

June 29, 2013.

Brian K. Herrington, Bartlett Law Offices, New Haven, Joseph W. Martini, Wiggin & Dana, LLP, Stamford, David J. Elliott, Kaitlin A. Canty, Day Pitney, LLP, Hartford, CT, David McMullan, Jr., John W. Barrett, Barrett Law Group, P.A., Lexington, MS, Keith M. Fleischman, June H. Park, Hung G. Ta, Fleischman Law Firm, C. William Phillips, Mari K. Bonthuis, Covington & Burling, LLP, New York, NY, for Plaintiffs.

C. William Phillips, Mari K. Bonthuis, Covington & Burling, LLP, New York, NY, David J. Elliott, Kaitlin A. Canty, Day Pitney, LLP, Hartford, CT, for Defendants.

### RULING ON MOTION TO DISMISS

ALVIN W. THOMPSON, District Judge.

The plaintiffs, Patriot Exploration, LLC, Jonathan Feldman, Redwing Drilling Partners, Mapleleaf Drilling Partners, Avalanche Drilling Partners, Penguin Drilling Partners and Gramax Insurance Company Ltd., allege that the defendants, SandRidge Energy, Inc. ("SandRidge"), SandRidge Exploration and Production, LLC, Tom L. Ward (Chief Executive Officer and Chairman of Board of Directors), Matthew K. Grubb (President, Executive Vice President and Chief Operating Officer), Rodney E. Johnson (SandRidge's Executive Vice President, Reservoir Engineering), Everett R. Dobson (a SandRidge director since September 24, 2009), William A. Gilliland (a SandRidge director), Daniel W. Jordan (a SandRidge director), Roy T. Oliver, Jr. (a SandRidge director) and Jeffrey S. Serota (a SandRidge director), provided misleading information on which the plaintiffs relied in deciding to invest in the exploration and drilling of oil wells. The plaintiffs bring claims against the defendants for violation of federal and state securities laws and common law. The defendants have moved to dismiss each count of the Amended Complaint (Doc. No. 26) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion to dismiss is being granted in part and denied in part.

### I. FACTUAL ALLEGATIONS

"The complaint, which [the court] must accept as true for purposes of testing its sufficiency, alleges the following circumstances." *Monsky v. Moraghan*, 127 F.3d 243, 244 (2d Cir.1997).

SandRidge is an independent oil and natural gas company headquartered in Oklahoma that focuses on oil development and production activities on lands in West Texas, Oklahoma and Kansas. SandRidge's primary area of focus in West Texas consists of the Permian Basin and the West Texas Overthrust ("WTO"). The WTO includes the Piñon gas field, where SandRidge claims to have over 500,000 net acres under lease. The Piñon gas field consists of several different reservoirs, the most prolific of which is the Warwick Caballos reservoir ("Warwick").

"In early 2009, in the immediate aftermath of the financial crisis, SandRidge was struggling with critical business challenges. Over the preceding two years, SandRidge had saddled itself with increasing debt, causing the Company to face an acute shortage of cash to finance its opera-

tions and meet contractual operations, including its exploration and drilling programs." (Am. Compl. ¶ 2.)

In October 2008, SandRidge announced that it would cut its 2009 capital expenditure budget from $2.0 billion to $1.0 billion. SandRidge also "announced a cut to its production outlook." (*Id.* at ¶ 3.) "On December 16, 2008, SandRidge was forced to reduce its capital expenditure budget for 2009 once again, from $1 billion to $500 million." (*Id.*) In each instance, SandRidge's stock price declined in response to the news of the reduction of its capital expenditure budget.

"With working capital drying up, SandRidge needed to find money to fund its exploration and drilling programs. Given that SandRidge's reserves of natural gas and oil constituted the Company's only assets and, thus, only source of revenue, SandRidge needed to drill to stay in business." (*Id.* at ¶ 4.) The plaintiffs allege, however, that there were two other significant reasons why SandRidge needed to maintain its drilling program.

First, in 2008, SandRidge entered into a 30–year agreement with Occidental Petroleum Corporation ("Occidental") to develop a West Texas hydrocarbon gas processing plant and related pipeline infrastructure. Under the agreement, "SandRidge was obligated to deliver certain volumes of carbon dioxide gas ('$CO_2$')" to Occidental. (*Id.* at ¶ 5.) In the event of a shortfall in delivery of $CO_2$ to Occidental, the agreement requires SandRidge to pay significant financial penalties. "[E]ven though SandRidge was constrained financially in its ability to expend capital on exploration and drilling, the Company needed to maintain a certain level of natural gas drilling and production in order to meet its contractual commitments to supply certain volumes of $CO_2$ to Occidental." (*Id.*) On

June 30, 2008, SandRidge announced that it had entered the 30–year agreement.

Second, "SandRidge was in advanced discussions to sell Piñon Gathering Company, LLC ('PGC'), SandRidge's indirect wholly-owned subsidiary" to TCW Energy. (*Id.* at ¶ 6.) "PGC owned and operated approximately 370 miles of gas gathering lines located in the same region where SandRidge conducted most of its gas exploration and drilling. As the value of PGC was directly related to the amount of gas that it gathered, SandRidge was motivated to ensure a steady volume of gas from its wells through PGC's pipelines in order to extract the highest possible sale price." (*Id.*) "[U]nder a sale agreement that was then being discussed, SandRidge would be required, after it sold PGC, to continue to deliver certain . . . gas volumes through PGC's gathering system in order to ensure a guaranteed rate of return for the purchaser." (*Id.*) Failure to do so obligates SandRidge to make monthly shortfall payments to PGC to ensure that PGC achieves a designated internal rate of return. On June 30, 2009, SandRidge announced that it had sold PGC to TCW Energy.

"Against this background, SandRidge looked to outside investors to inject money into the Company's exploration and drilling program." (*Id.* at ¶ 7.) In the oil and gas industry, investors often participate in exploration and drilling programs on a "promoted basis." The investor agrees to invest a certain percentage of the drilling costs of each well in return for receiving a lesser percentage of the revenues from that well. Commencing in January 2009, SandRidge entered into discussions with representatives of U.S. Drilling Capital Management LLC ("USDCM") seeking potential investors to participate on a promoted basis in drilling projects in the Piñon gas fields. USDCM is an investment

company organized for the purposes of identifying investment opportunities in the field of energy exploration, development and production. The plaintiffs had hired USDCM to identify investment opportunities for them.

As part of their evaluation of the investment opportunities related to the Piñon gas field, USDCM and plaintiff Patriot Exploration, LLC ("Patriot"), on behalf of the group of plaintiffs, reviewed documents provided by SandRidge including, without limitation, data pertaining to historical profitability of nearby wells and estimates of reserves and profitability of the wells in which the plaintiffs would be investing (the "Participation Wells"). The plaintiffs also reviewed SandRidge conference calls, investor presentations and filings with the Securities and Exchange Commission ("SEC"), including the 10–K filing for 2008. In addition, the plaintiffs hired an independent petroleum engineering consultant to conduct further analysis of the Piñon wells that would constitute the plaintiffs' investment. The plaintiffs' engineering consultant relied on data provided by SandRidge "because SandRidge has done extensive drilling of wells in west Texas and has sole access to large amounts of proprietary data on the Piñon wells." (Am. Compl. ¶ 50.)

The plaintiffs allege that, "to induce Plaintiffs to make their investments, SandRidge and its senior officers issued misleading statements and omitted material information that had the effect of overstating the expected returns from SandRidge's wells. These misstatements and omissions fell into at least four categories." (Id. at ¶ 8.)

First, SandRidge and its senior officers deliberately concealed the loss of natural gas during the treatment process, a process known as "plant shrink." When natural gas is drawn from a well as "raw" or "wet" gas, it is mixed with $CO_2$ and other waste gases. Thus, the raw gas is treated to remove $CO_2$ before it can be distributed and sold. In the course of treatment, natural gas is lost because some of the methane is used as fuel to run the treatment plant. An additional amount of methane and other gases cannot be separated from the $CO_2$ and is irretrievably lost during the treatment process. As Plaintiffs have now learned, the plant shrink historically experienced by SandRidge results in a reduction in the net amount of sellable methane gas so that just *25%* of the total raw gas is sellable.

(Id. at ¶ 9 (emphasis in original).)

Second, and closely related to their failure to disclose plant shrink, SandRidge and its senior officers repeatedly overstated the amount of average reserves of methane gas per well for the wells that the Company had historically drilled. Specifically, in numerous presentations and other communications, SandRidge represented that SandRidge had managed to increase the average reserves of raw gas in its drilled wells to 7.5 Bcfe (billion cubic feet of gas equivalent) per well, of which methane gas constituted approximately 3 Bcfe per well. However, this figure of 3 Bcfe failed to take into account the effects of plant shrink. After losses due to plant shrink, the net amount of methane gas for sale was only approximately 1.5 Bcfe, *half* the amount SandRidge touted.

(Id. at ¶ 10 (emphasis in original).)

Third, in a further effort to conceal the negative impact of plant shrink, SandRidge and its senior officers repeatedly referred in their presentations and discussions to *final sale prices* for the methane gas (that is, prices at the pipeline or the point of sale to consumers), explicitly projecting internal rates of re-

turn which were based on these *final sale prices.* By repeatedly doing this, SandRidge and its senior officers reinforced the fraudulent perception that all of the natural gas (including the amounts that should have been excluded to reflect plant shrink) was available for sale at the pipeline. In fact, as SandRidge and its senior offices knew, the natural gas could not be sold without first being treated, and the amount of natural gas would inevitably be reduced due to plant shrink during treatment. (*Id.* at ¶ 11 (emphasis in original).)

*Fourth,* SandRidge and its senior officers repeatedly understated the expenses associated with methane production from its wells. For example, because the average reserves of sellable methane gas per well was only 1.5 Bcfe (not 3.0 Bcfe) out of the total volume of raw gas of 7.5 Bcfe, SandRidge effectively had to move a greater volume of non-sellable, waste gas through the pipelines (6.0 Bcfe as opposed to 4.5 Bcfe), resulting in a significant increase in the treatment and transportation costs associated with producing sellable methane gas. Even more egregiously, SandRidge and its senior officers itemized for Plaintiffs ten different and distinct fees and expenses associated with gas production, but omitted the over-riding, most important economic factor—namely, loss of gas due to plant shrink. Thus, when inputting the expected expenses into their own economic models, Plaintiffs were misled into believing that the expenses identified by SandRidge constituted the universe of expenses associated with gas production. (*Id.* at ¶ 12 (emphasis in original).)

The plaintiffs further allege specific misstatements made on particular dates. On January 21, 2009, defendant Ward, SandRidge's Chief Executive Officer and Chairman of the Board of Directors, e-mailed a representative of USDCM stating "You know that we drill low finding cost areas and the Piñon Field Warwick Thrust has one of the best ROR [rates of return] in America. We reviewed vs information of all the best shale plays and the Pinedale Anticline." (*Id.* at ¶ 69.) This statement was made without factoring in the impact of "plant shrink" on the rate of return. Plant shrink is the necessary loss of methane gas during the treatment process which turns "raw" or "wet" gas into gas that can be distributed and sold.

On March 3, 2009, SandRidge held an analyst conference in New York and showed a PowerPoint presentation discussing, among other things, the economics of its agreement with Occidental. At the beginning of the presentation a slide labeled "Disclaimer" stated:

This presentation has forward-looking statements, including those concerning SandRidge Energy, Inc.'s future operations, projected production volumes, estimates of reserve volumes, reserve values and reserve potential, future drilling locations, expected $CO_2$ processing capacity. . . . These statements are based on assumptions and analyses made by us in light of our experience and our perception of historical trends, current conditions and expected future developments as well as other factors we believe are appropriate under the circumstances. . . . [A]ctual results or developments may differ materially from those projected in the forward-looking statements.

. . . .

The SEC permits oil and gas companies, in their filings with the SEC, to disclose only proven reserves that a company has demonstrated by actual production or conclusive formation tests to be econom-

ically and legally producible under existing economic and operating conditions. We use the terms "3P" reserves (which means total proven, probable and possible reserves), and "EUR" (estimated ultimate reserves) and other descriptions of volumes of reserves potentially recoverable through additional drilling or recovery techniques that the SEC's guidelines prohibit us from including in filings with the SEC.

(Aff. of Grace Lee, Ex. B (Doc. No. 21–8 to 21–17) at 2.)

Over the course of the approximately 100-slide PowerPoint presentation the defendants made false and misleading statements and omissions. On page 8, SandRidge stated that its estimates for net methane from high $CO_2$ gas assumed that the gas stream contains 65% $CO_2$ and 35% methane. This statement did not include the impact of plant shrink on net methane available for sale.

Page 27 of the presentation indicated that SandRidge had been able to increase the estimated amount of reserves per well from 5.0 Bcfe/PUD (billion cubic feet of gas equivalent/proved undeveloped) to 7.5 Bcfe/PUD. SandRidge failed to disclose that the increase of 2.5 Bcfe did not reflect an increase in the average net methane available per well. The statement was also inconsistent with certain SEC regulations and with provisions of the Petroleum Resources Management System, both of which provide that reserves are to be measured based on the amount of methane gas available for sale at the pipeline. The Petroleum Resources Management System is "released by the Society of Petroleum Engineers, the American Association of Petroleum Geologists, the World Petroleum Council and the Society of Petroleum Evaluation Engineers." (Am. Compl. ¶ 64.)

Page 36 of the presentation lists five gas producing properties and gives their rates of return. The rate of return listed for Warwick is 26%, the highest of the properties listed. This rate of return was calculated without considering the reductions in methane and expenses associated with plant shrink. Furthermore, the calculation of the rate of return was inconsistent with SEC regulations and the Petroleum Resources Management System.

On March 16, 2009, SandRidge provided USDCM and the plaintiffs with access to a package of documents loaded onto an external file transfer protocol site. One of the documents was a PowerPoint presentation entitled "Reservoir—Rodney E. Johnson, Executive Vice President—Reservoir Engineering." Several of the slides included in the March 3, 2009 presentation were also included in the Reservoir presentation. In one slide, SandRidge assumes that the "methane content" of the raw gas extracted from a given wellhead is 44.81%. This 44.81% figure was used to calculate the projected rate of return of 26%, applying the sales price of natural gas at the pipeline. These projections failed to include any adjustment for plant shrink.

Another document uploaded to the file transfer protocol site was entitled "Reserves and Economics." The Reserves and Economics document purported to provide a summary of the economic returns (on a per well basis) of the proposed investment from the plaintiffs' perspective. Specifically, SandRidge projected that raw gas production from each well would be approximately 7.5 Bcfe and that 45.8% of that would be methane gas available for sale. Based on the assumption that the plaintiffs' promoted basis interest would be 18.726% per well, the plaintiffs' net methane gas per well would have been 0.6432 Bcfe, which the defendants multiplied by

the pipeline sales price to calculate a projected final sales price. Based on gas sales prices as of February 18, 2009, SandRidge projected that the plaintiffs' investment would produce an operating income of $2,409,039 and net cash flow of $1,468,539, for a rate of return of 16.66%. However, the effects of plant shrink were not taken into account. A third party consultant has estimated that, if plant shrink had been taken into account, the plaintiffs' investment would have produced an estimated net operating income of $1,739,461 and net cash flow of negative $250,856.

On September 9, 2009, SandRidge participated in a CEO Energy Conference hosted by Barclays, during which SandRidge gave a presentation discussing the Warwick reservoir in the Piñon gas field. During the presentation, SandRidge represented that the estimated ultimate recovery of raw gas from each well in the Warwick reservoir was 7.518 Bcfe and that the net natural gas from each well was 3.018 Bcfe, or approximately 40%. The actual amount of net methane gas per well was around 1.5 Bcfe, or approximately 20%. By using the 3.018 Bcfe figure, SandRidge stated that the Warwick wells had more than twice the next highest reserves of 1.442 Bcfe from wells in the "Dug Out Creek" reservoir.

On September 29 and 30, 2009, SandRidge gave a presentation at the Deutsche Bank Leveraged Finance Conference in Scottsdale, Arizona. During the presentation, SandRidge stated again "that the Warwick reservoir compared favorably with other continental U.S. reservoirs because it produced a rate of return of 26%." (Am. Compl. ¶ 83.) This representation failed to take into account plant shrink.

On November 6, 2009, SandRidge held a 2009 third quarter earnings conference call in which Tom Ward stated that "Every-

thing within the Warwick Thrust is continuing to be exactly as we have stated. It's basically 7.5 Bcf[e] per well and anticipated 62% $CO_2$ content and the per-well economics have stayed the same. We don't anticipate changing those." (Id. at ¶ 84.)

On May 5, 2009, USDCM and Patriot entered into the Participation Agreement with SandRidge. Under the Participation Agreement, they would participate in SandRidge's 2009 drilling program by committing up to $75 million towards the cost of drilling and completing the Participation Wells in the Warwick reservoir on certain lands owned or leased by SandRidge in the Piñon gas field. The $75 million was to be funded in three tranches, the first consisting of $15 million and the second and third consisting of $30 million each. Each tranche was to be used to fund a distinct set of Participation Wells.

As to the first tranche of $15 million, $10 million was payable immediately with the remaining $5 million becoming due as the wells were drilled. The second and third tranches were optional, and USDCM and Patriot would have the right, but not the obligation, to continue to invest in the Participation Wells. The Participation Agreement provided that the plaintiffs' participation would be on a 25%/18.75% promoted basis. The plaintiffs would pay for 25% of the costs associated with drilling the wells, and they would receive 18.75% of the revenues.

The signatories to the Participation Agreement were SandRidge Exploration and Production, LLC, USDCM and Patriot. Feldman signed on behalf of Patriot. On May 5, 2009, the day the Participation Agreement was signed, USDCM assigned its entire interest in the Participation Wells to Patriot. Section 9.1(b) of the Participation Agreement provides:

After the initial assignment of the Earned Interest in an Earning Well to either USD or Patriot, as the case may be, no subsequent assignment of any such Earned Interest shall be permitted without the prior written consent of SandRidge, which will not be unreasonably withheld; provided, however, SandRidge's consent shall not be required for an assignment of any such Earned Interest to a partnership of which Montcalm is the managing general partner. In determining the reasonableness of SandRidge's decision, SandRidge may consider such factors as the creditworthiness of the proposed assignee, as determined by SandRidge in its sole, but reasonable discretion. Notwithstanding the foregoing, ... any assignment of any such Earned Interest to a partnership of which Montcalm is the managing general partner or any other third parties shall require the assignee to make the representations and warranties set out in Sections 6.2 and 6.3 above.

Between May 16 and October 9, 2009, Patriot assigned the entirety of its interest to the remaining plaintiffs as follows: Jonathan Feldman—16.67%; Redwing Drilling Partners—23.86%; Mapleleaf Drilling Partners—26.04%; Avalanche Drilling Partners—24.18%; Penguin Drilling Partners—4.26%; and Gramax Insurance Company, Ltd.—5.00%. Plaintiffs Redwing Drilling Partners, Mapleleaf Drilling Partners, Avalanche Drilling Partners and Penguin Drilling Partners all have as their managing general partner Montcalm Co., LLC. Feldman is the founder, chairman and CEO of Patriot. Gramax Insurance Company, Ltd. is wholly owned by Feldman.

On May 7, 2009, Patriot sent a wire transfer to SandRidge in the amount of $10 million. On October 8, 2009, the plaintiffs sent an additional $2.5 million. On October 29, 2009, the plaintiffs made a payment of $1 million. The plaintiffs have also expended close to $15 million for audit expenses and other expenses.

As of October 28, 2011, the plaintiffs had participated with respect to the drilling of twenty-five wells under the first tranche of the Participation Agreement, twenty-three of which are now complete. The wells are producing at rates that are approximately 30% below what had been anticipated based on the pre-drill estimates prepared from information provided by SandRidge. In some cases, over 75% of the net gas in the Participation Wells was lost as a result of the extraction of $CO_2$ and plant shrink. Because of the poor performance of these wells, the plaintiffs declined to participate in the second and third tranches.

## II. LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 557,

127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted). However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Mytych v. May Dept. Stores Co.,* 34 F.Supp.2d 130, 131 (D.Conn.1999) (quoting *Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984)). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.,* 727 F.Supp. 784, 786 (D.Conn.1990) (citing *Scheuer,* 416 U.S. at 232, 94 S.Ct. 1683).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir. 1993). The court may consider a document if "the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (quoting *Int'l Audiotext Network, Inc. v. Amer. Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).

"[ A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.* (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991)). The court may also consider "public disclosure documents required by law to be, and that have been, filed with the SEC." *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000).

Allegations of fraud or mistake, including allegations of securities fraud under § 10(b) of the Exchange Act and Rule 10b5, are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Because the plaintiffs' state law claims are predicated on the same factual allegations as their federal claims, the Connecticut, Oklahoma and Texas securities law claims are also subject to the heightened pleading requirements of Rule 9(b).[1]

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This Court has read Rule 9(b) to require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."

---

1. The plaintiffs argue that Rule 9(b) is inapplicable to their Connecticut, Oklahoma and Texas state securities law claims because the state laws do not require each of the elements of a "classic fraud claim." However, the language of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004).

*Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004) (internal citations omitted).

■ Congress enacted the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737 (codified in scattered sections of 15 U.S.C.), (the "PSLRA") "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). The PSLRA applies to the plaintiffs' federal securities law claims. "The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1978)).

## III. DISCUSSION

The court has considered the Participation Agreement between SandRidge, USDCM and Patriot (Aff. of Grace Lee, Ex. A (Doc. No. 21–1 to 21–7)); the PowerPoint presentation entitled "Investor/Analyst Meeting," dated March 3, 2009 (Aff. of Grace Lee, Ex. B); and the PowerPoint presentation entitled "Deutsche Bank: Leveraged Finance Conference," dated September 29–30, 2009 (Aff. of Grace Lee, Ex. C (Doc. No. 21–18)), the terms and effects of which the plaintiffs heavily relied upon in the complaint. The court has also considered SandRidge's Form 10–K for the fiscal year ending December 31, 2008 (Aff. of Grace Lee, Ex. D (Doc. No. 21–19)), which is a public disclosure that is required by law to be, and was, filed with the SEC.

### A. Standing

The defendants contend that the fraud claims must be dismissed because the plaintiffs lack standing. The defendants argue that Patriot lacks standing because it assigned all of its interest in the Participation Wells to the other plaintiffs and thus has failed to plead that it suffered a loss. The defendants argue that all the other plaintiffs lack standing because SandRidge made no representations to them.

■ "In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction ... [and includes] a core component derived directly from the Constitution." *Allen v. Wright*, 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (citation omitted).

> The three elements comprising Article III standing are well established: a plaintiff must show (1) an "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the plaintiff's injury and the challenged conduct; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 102 (2d Cir.2011).

■ The defendants argue that Patriot has failed to plead an injury in fact because it assigned all of its interest in the Participation Wells to the other plaintiffs and therefore suffered no loss when the wells failed to perform as anticipated. "One who alleges fraud, at common law or under the federal securities laws, generally is entitled to [consequential] damages." *The Ltd., Inc. v. McCrory Corp.*, 683 F.Supp. 387, 393 (S.D.N.Y.1988). Recoverable consequential damages may include out-of-pocket expenses that are the proxi-

mate and natural consequence of the defendants' allegedly fraudulent acts. *See id.* ("attorney's fees [are] recoverable if they are 'the proximate and natural consequence of defendants' tortious act which requires plaintiff to defend or bring an action against a third party'" (quoting *Central Trust Co. v. Goldman,* 70 A.D.2d 767, 417 N.Y.S.2d 359, 361 (4th Dep't 1979))).

The plaintiffs allege that they "have expended additional amounts in the form of audit expenses and other expenses." (Am. Compl. ¶ 99.) The defendants argue that these expenses fail to satisfy the causal connection requirement for establishing damages in a securities fraud action because the plaintiffs have failed to allege that the expenses were a direct result of the purported fraud. However, the plaintiffs have also alleged that they "subsequently learned from an independent report produced by a third party consultant, Ancell Energy, [that] if plant shrink had been taken into account, Patriot's investment would have produced net operating income of only $1,739,461; net cash flow of *negative $250,856;* and a present value of *negative $586,543.*" (*Id.* at ¶ 81 (emphasis in original).) Drawing all inferences in favor of the plaintiffs, the allegations in the complaint support the conclusion that the plaintiffs incurred additional expenses, i.e. for items such as the report prepared by Ancell Energy, as a result of the allegedly fraudulent behavior of the defendants. Also, the fact that the plaintiffs would incur out-of-pocket costs in investigating the failure of the plaintiffs' investment in the Participation Wells to yield the rate of return that had been originally estimated is a proximate and natural result of the fraud alleged, i.e. that SandRidge inflated the estimated rate of return by omitting the impact of plant shrink.

■ The defendants argue that the plaintiffs have failed to plead facts showing that the plaintiffs other than Patriot have standing because "they cannot establish that SandRidge made any misrepresentations to them or otherwise injured them" and the mere fact that they were assigned interests in the Participation Wells by Patriot is insufficient to support a claim that they were defrauded. (Def. Br. in Supp. of Mot. to Dismiss (Doc. No. 34) ("Def. Mem.") at 24.)

■ "[P]rivity between plaintiffs and defendants is not a requisite element of a Rule 10b–5 cause of action for damages." *Shapiro v. Merrill Lynch, et al.,* 495 F.2d 228, 239 (2d Cir.1974).

> The indirect reliance doctrine states that "a claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff]."

*Amusement Indus., Inc. v. Stern,* 786 F.Supp.2d 758, 773 (S.D.N.Y.2011) (quoting *Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 310 (2d Cir.1994)) (alterations in original). Also, "a fraudulent misrepresentation made with 'notice in the circumstances of its making' that the person to whom it was made would communicate it to third parties subjects the person making the misrepresentation to liability to the third party." *Ostano Commerzanstalt v. Telewide Sys., Inc.,* 794 F.2d 763, 766 (2d Cir.1986).

While SandRidge negotiated with USDCM and Patriot, it did so with the understanding that USDCM or Patriot could assign its interest in the Participation Wells to partnerships of which Montcalm Co., LLC ("Montcalm") was the managing general partner. Section 9.1(b)

of the Participation Agreement explicitly discusses assignment and provides that SandRidge's consent is not required for an assignment to a partnership of which Montcalm is the managing general partner. The complaint alleges that Montcalm is the managing general partner of each of Redwing Drilling Partners, Mapleleaf Drilling Partners, Avalanche Drilling Partners and Penguin Drilling Partners. Thus, each of these plaintiffs received the information from a person who had received it from the defendants under circumstances where the defendants intended for the information to be conveyed to that plaintiff.

In addition, Section 9.1(b) provides for assignments to other assignees with the prior written consent of SandRidge, and the complaint alleges that Patriot received permission from SandRidge "to assign part of its interest in the Wells to Feldman and Plaintiff Gramax Insurance Company." (Am. Compl. ¶ 15.) Moreover, the complaint alleges that "[i]n the course of the parties' negotiations, SandRidge and its officers provided USDCM, Patriot and Feldman with access to various materials to assist them in conducting their due diligence of SandRidge's wells ..." (*Id.* at ¶ 54), and Feldman signed the Participation Agreement on behalf of Patriot. Thus, the defendants made the alleged misrepresentations with notice in the circumstances of their making that they would be communicated to, and relied upon, by Feldman and Gramax Insurance Company LLC.

Because each of the plaintiffs has alleged an injury, even where merely consequential, as a result of fraudulent misrepresentations made by the defendants, and on which that plaintiff was entitled to rely, the plaintiffs do not lack standing with respect to the fraud claims.

## B. Federal Securities Law Claims

The plaintiffs bring claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, (First Cause of Action) alleging that defendants SandRidge, SandRidge Exploration and Production, LLC, Ward, Grubb and Johnson defrauded the plaintiffs, and under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), (Seventh Cause of Action) alleging control person liability against defendants Ward, Grubb, Johnson, Dobson, Gilliland, Jordan, Oliver and Serota.

### 1. *Section 10(b) and Rule 10b–5*

The defendants argue that the First Cause of Action, alleging violation of Section 10(b) and Rule 10b–5, should be dismissed under Fed.R.Civ.P. 12(b)(6) because the plaintiffs have failed to adequately plead scienter under the PSLRA, the plaintiffs could not have reasonably relied on any of the alleged misrepresentations, and the plaintiffs here failed to allege loss causation. The defendants also argue that the plaintiffs have failed to meet the heightened pleading standards of Rule 9(b).

Section 10(b) and Rule 10b–5 prohibit fraudulent conduct in connection with securities transactions. Section 10(b) makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 specifies the following actions as being among the

types of behavior proscribed by the statute:

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

17 C.F.R. § 240.10b–5.

> In order to state a cause of action under section 10(b) and Rule 10b–5, "a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff's] injury."

*Chill v. General Elec. Co.,* 101 F.3d 263, 266 (2d Cir.1996) (quoting *Acito v. IMC-ERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir. 1995)) (alterations in original).

### a. Scienter

 "The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5, that the plaintiff must allege is 'an intent to deceive, manipulate or defraud.'" *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001) (quoting *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 168 (2d Cir.2000)). "A plaintiff can establish this intent 'either (a) by alleging facts to show that the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *Acito,* 47 F.3d at 52).

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

Under this heightened pleading standard for scienter, a "complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively." The "strong inference" standard is met when the inference of fraud is at least as likely as any non-culpable explanations offered.

*Slayton v. Am. Express Co.,* 604 F.3d 758, 766 (2d Cir.2010).

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the "smoking-gun" genre, or even the "most plausible of competing inferences." ... Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.

*Tellabs, Inc.,* 551 U.S. at 324, 127 S.Ct. 2499.

The defendants argue that the allegations in the complaint are insufficient, under the PSLRA's heightened pleading standard, to show either motive and opportunity or strong circumstantial evidence of conscious misbehavior or recklessness.

### (i) Motive and Opportunity

 The plaintiffs allege that the defendants had two principal motivations for

fraudulently inducing the plaintiffs to invest in the Participation Wells: first, to raise funds to enable SandRidge to maintain a certain level of natural gas drilling and production in order to meet its contractual commitments to Occidental and avoid significant financial penalties for which SandRidge could be liable pursuant to the agreement with Occidental; and second, to ensure a steady volume of gas from SandRidge's wells through PGC's pipelines and thus get the highest possible sale price for PGC. The defendants argue that these motivations are "non-sensical" given that SandRidge invested three times as much in the same drilling projects; the defendants do not appear to contest that they would have had the opportunity to commit the alleged fraud.

> Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud.

*Kalnit*, 264 F.3d at 139 (internal quotation marks omitted).

On June 30, 2008, SandRidge announced the 30–year agreement with Occidental. The agreement committed SandRidge to deliver certain volumes of $CO_2$, with significant financial penalties in the event of any shortfall. To meet its obligations under the agreement, SandRidge needed to continue to make capital expenditures to drill for gas. Also, with respect to SandRidge's then-ongoing negotiations to sell PGC to TCW, the complaint alleges that "the value of PGC was directly related to the amount of gas that it gathered" therefore making it "in SandRidge's interest to ensure a steady volume of gas from its wells through PGC's pipelines in order to extract the highest possible sale price for PGC." (Am. Compl. ¶ 42.)

The plaintiffs also allege that at the time SandRidge had a desire to maintain its drilling program, to stay in business and also for the reasons discussed above, and that its working capital was drying up and it needed money to fund its exploration and drilling programs. The plaintiffs allege that, consequently, the defendants manipulated information regarding the historical profitability of wells in the WTO, thereby inflating estimates for profitability of new wells, to induce them to invest in the Participation Wells—also located in the WTO.

These factual allegations support the inference that the defendants anticipated, and in fact realized, a concrete benefit from the misrepresentations that induced the plaintiffs to invest in the Participation Wells. The defendants expected that SandRidge would be better able to meet its contractual obligations to Occidental, thus mitigating the significant financial penalties, and also expected that SandRidge's position in the negotiations with TCW would be improved. The nonculpable explanation offered by the defendants is that "SandRidge invested based on the same profit motives as Plaintiffs, which unfortunately were not realized." (Def. Mem. 28.) Also, the defendants point to the fact that SandRidge is alleged to have invested three times more than the plaintiffs in the Participation Wells.

 In assessing the relative likelihood of the inference of scienter versus the nonculpable explanations, the court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 323, 127 S.Ct. 2499 (emphasis in

original). Relevant is the fact that on May 7, 2009, Ward described transactions SandRidge had engaged in and then stated that "the[ ] transactions combined with cash flow generated from operations will provide us with the strong balance sheet needed to fill Phase I of the Century Plant in 2010 and Phase II in 2011" (Am. Compl. ¶ 41 (emphasis omitted)), thus acknowledging that cash flow from operations alone would not be sufficient. Also relevant is the fact that while SandRidge disclosed the extent and effect of plant shrink in its filings with the SEC, the defendants did not do so in the statements relied upon by the plaintiffs. In addition, it is relevant that the plaintiffs had invested on a promoted basis, so while the plaintiffs would realize less than their proportionate share of the revenues based on their investment, SandRidge would realize a greater than proportionate share. Finally, accepting the factual allegations of the complaint as true, there is no nonculpable explanation for the alleged misrepresentations, only the nonculpable inference that failure to take plant shrink into account in the calculations was an oversight despite the fact that plant shrink had been properly taken into account in filings with the SEC. Finally, as to the two principal motivations identified by the plaintiffs, both the contract with Occidental and the negotiations with TCW relate to concrete and personal benefits to the defendants that are extrinsic to the performance of the Participation Wells themselves and in which the plaintiffs would not share.

Therefore, the court concludes that, at this stage of the case, the inference of fraud is cogent and compelling in the light of any possible nonculpable explanation.

### (ii) Conscious Misbehavior or Recklessness

█ The defendants argue that the factual allegations in the complaint constitute nothing more than a claim that SandRidge was wrong in its predictions of future profits and outputs, which does not suffice to create a strong inference of fraudulent intent. The plaintiffs contend that they have alleged facts constituting strong circumstantial evidence that the defendants were, at the very least, reckless in making false and misleading statements. The court agrees with the plaintiffs.

█ " '[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.' " Slayton, 604 F.3d at 773 (quoting Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 274 (3d Cir.2009)). Forward-looking statements contain

> three implicit factual assertions—"(i) that the statement is genuinely believed; (ii) that there is a reasonable basis for that belief; and (iii) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." ... "[ A] forward looking statement is misleading if the speaker actually knows that one or more of these implicit factual representations is not true."

Id. at 774 (internal citations omitted).

The complaint alleges that SandRidge projected that the plaintiffs' investment would produce "an operating income of $2,408,039; net cash flow of $1,468,539; a rate of return of 16.66%; and a present value of $303,431." (Am. Compl. ¶ 81.) It also alleges that the independent report prepared by Ancell Energy estimates that if plant shrink had been taken into account then the calculations would have projected that the plaintiffs' investment "would have produced net operating income of only $1,739,461; net cash flow of negative

$250,856; and a present value of negative $586,543." (*Id.* (emphasis omitted).) The disclosures made by SandRidge in its filings with the SEC explaining plant shrink and the extent and effect of plant shrink on SandRidge's operations demonstrate that the defendants were aware that information about plant shrink was material to an understanding of SandRidge's operations. A reasonable inference could be drawn that the defendants had actual knowledge of SandRidge's failure to take into account plant shrink in calculations relied upon by the plaintiffs and that SandRidge's failure to do so was an undisclosed fact that seriously undermined the accuracy of the projections provided by the defendants.

Moreover, the plaintiffs also allege that certain non-forward looking statements were false and misleading, specifically statements related to the historical performance of wells in the WTO upon which the future projections were based. For example, the complaint alleges that the defendants repeatedly represented that the rate of return for wells in the Warwick reservoir was 26%, thus making it "one of the best [rates of return] in America." (Am. Compl. ¶ 69.) A reasonable inference could be drawn that the defendants were at least reckless in disseminating rate of return information that did not take into account the impact of plant shrink, a significant factor.

The fact that plant shrink is explained and its impact is taken into account in SEC filings runs counter to any inference that not discussing it or its impact on SandRidge's operations in the defendants' statements to relied upon by the plaintiffs was inadvertent. Thus, "accepting the whole factual picture painted by the [c]omplaint, it is at least as likely as not that defendants acted with scienter." *Slayton,*

604 F.3d at 775 (quoting *Avaya, Inc.,* 564 F.3d at 269).

Therefore, the court concludes that the plaintiffs have alleged with particularity facts that give rise to a strong inference of scienter, both by demonstrating motive and opportunity and by providing strong circumstantial evidence of conscious misbehavior or recklessness.

### b. Reliance

 "The general rule is that reasonable reliance must be proved as an element of a securities fraud claim." *Harsco Corp. v. Segui,* 91 F.3d 337, 342 (2d Cir.1996). "In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir.2003). The defendants argue that the plaintiffs cannot show reasonable reliance for four reasons: first, that disclaimers in the Participation Agreement preclude reliance on extra-contractual representations; second, that the plaintiffs are sophisticated consumers who had access to the information allegedly concealed, and the information was available to the plaintiffs before they made their investments; third, that any allegedly misleading forward-looking statements are within the PSLRA's safe harbor; and fourth, that the allegedly misleading statements were either puffery or otherwise non-actionable.

### (i) Disclaimers

 The defendants argue that disclaimers in the Participation Agreement preclude the plaintiffs from claiming reasonable reliance on the alleged misrepresentations. The Participation Agreement reads, in pertinent part, as follows:

6.1 *Disclaimer of SandRidge Representations and Warranties.* US Drilling hereby acknowledges that, except as ... expressly set forth in Section 6.4, below, SandRidge makes no representations or warranties with respect to (i) the Subject Leases, the Subject Interests and the Subject Lands, including, without limitation, the presence of hydrocarbons thereon or thereunder, (ii) the results that might be expected from exploration, production and development activities on the Subject Leases, the Subject Interests and the Subject Lands, and (iii) the costs associated with such activities.

. . . .

9.14 *Entire Agreement.* This Agreement, together with the Exhibits hereto, represents the entire agreement between the Parties with respect to the subject matter hereof and replaces all previous agreements, oral or written, made and entered into between the Parties.

(Aff. of Grace Lee, Ex. A at 19, 24.)

The defendants properly cite *Harsco Corp.*, 91 F.3d at 345, for the proposition that "where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon." Also, "[a] disclaimer is generally enforceable only if it 'tracks the substance of the alleged misrepresentation.'" *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 330 (2d Cir.2002) (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir.1984)).

However, even where a representation is specifically disclaimed, the peculiar knowledge exception may apply. Under the peculiar knowledge exception:

"even where the parties have executed a specific disclaimer of reliance on a seller's representations, a purchaser may not be precluded from claiming reliance on any misrepresentations if the facts allegedly misrepresented are peculiarly within the seller's knowledge." [The exception] finds its theoretical basis in the premise that "when matters are peculiarly within the defendant's knowledge, plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." And the inquiry as to whether the defendant has peculiar knowledge of the facts at issue, of course, goes to the reasonableness of the plaintiff's reliance—if the plaintiff has the means of learning the facts *and* disclaims reliance on the defendant's representations, there simply is no reason to relieve it of the consequences of both its failure to protect itself and its bargain to absolve the defendant of responsibility. On the other hand, if the plaintiff has conducted the appropriate due diligence and reasonably believes that it has corroborated the defendant's representations, then a different result may be warranted.

*DIMON Inc. v. Folium, Inc.*, 48 F.Supp.2d 359, 368 (S.D.N.Y.1999) (internal citations and alterations omitted); *see also In re MarketXT Holdings Corp.*, Bankruptcy No. 04–12078(ALG), 2006 WL 2864963 at *12 (Bankr.S.D.N.Y. Sept. 29, 2006) (applying the peculiar knowledge exception to federal securities fraud). "[T]he peculiar knowledge exception applies not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty." *DIMON Inc.*, 48 F.Supp.2d at 368. "The fundamental

question is whether the difficulty of conducting a sufficiently intensive review, given the information otherwise available, was so great that reliance upon the defendants' representations was reasonable notwithstanding the disclaimer." *Id.* at 369. In answering this question, the court must remember "that this is a motion to dismiss, not even a motion for summary judgment," and therefore the court must draw inferences in favor of the non-moving party. *Id.*

As discussed above, the plaintiffs allege misleading statements and omissions related to plant shrink that fall into at least four categories: inflating the expected rate of return by concealing the occurrence of and the extent of plant shrink; overstating the amount of average reserves of methane gas per well; calculating rates of return by applying final sales prices at the pipeline to the amount of gas at the wellhead, i.e. before plant shrink; and understating the expenses associated with methane production from SandRidge's wells. Each of these types of misrepresentations falls within the scope of the disclaimer, which states that no representations or warranties have been made with respect to either the "results that might be expected from exploration, production and development activities" or "the costs associated" with the exploration, production and development activities upon the Subject Lands.

However, the allegations in the complaint establish the applicability of the peculiar knowledge exception. The plaintiffs' allegations support a conclusion that it was within the peculiar knowledge of the defendants that their statements relied upon by the plaintiffs did not take into account the effects of plant shrink. The defendants argue that the plaintiffs should have been aware of the impact of plant shrink on the operations of SandRidge because it was fully disclosed in SandRidge's SEC filings. However, there is a difference between the plaintiffs being aware that plant shrink had on impact on the operations of SandRidge and the plaintiffs knowing that plant shrink had not been taken into account in calculating the estimates and projections provided to USDCM and Patriot by the defendants. The plaintiffs assert that they were misled by the defendants' estimates and projections *because* of the fact that the impact of plant shrink was accounted for in filings with the SEC and there was no disclosure alerting them to the fact that it was not accounted for in the estimates and projections provided by the defendants to USDCM and Patriot.

Furthermore, the complaint alleges that the plaintiffs hired an independent petroleum engineer consultant who relied upon "large amounts of proprietary data on the Piñon wells" to which the defendants had sole access. (Am. Compl. ¶ 50.) Finally, a belief on the part of the plaintiffs that all expenses associated with methane production had been accounted for was not unreasonable given the allegation that the estimates and projections provided by the defendants showed revenue amounts based on gas available at the pipeline, a point in the sales process after which plant shrink would have already occurred.

Thus, the allegations in the complaint support a conclusion that the plaintiffs did not have the means to learn the true facts, and also support a conclusion that the difficulty of conducting a review sufficient to discover the alleged misrepresentations was such that reliance upon the defendants' statements was reasonable despite the presence of the disclaimer.

(ii) Sophisticated Consumers; Information was Available

The defendants argue that the plaintiffs, as sophisticated parties, cannot

claim justifiable reliance where they had the capability to make their own assessment of the merits of investment in the Participation Wells. "'Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.'" *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 89 Fed.Appx. 287, 292 (2d Cir.2004) (quoting Restatement (Second) of Torts § 545A, comment b (1977)) (alterations in original). "It is well established that '[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, ... courts are particularly disinclined to entertain claims of justifiable reliance.'" *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1541 (2d Cir.1997). However, "[w]hen a defendant claims ... that the plaintiff was sophisticated and therefore less likely to have justifiably relied on a representation, the 'justifiable' determination nonetheless remains fact sensitive. The existence of any expertise or sophistication is a circumstance considered by the factfinder when it decides the issue. *See, e.g. Roberts* [*v. United New Mexico Bank at Roswell*], 14 F.3d [1076] at 1080 [ (5th Cir.1994) ]." *Nat'l Western Life Ins. Co.,* 89 Fed.Appx. at 292.

The defendants argue that the plaintiffs, as sophisticated investors, had access to information about the impact of plant shrink, which was disclosed in their SEC filings, and therefore cannot now claim to have justifiably relied upon representations by the defendants allegedly omitting to discuss plant shrink and its impact on SandRidge's operations. The Participation Agreement contains a provision pursuant to which the plaintiffs represent that they are "knowledgeable and experienced in the oil and gas business" and are "relying on [their] own independent investigation, evaluation and judgment" regarding the "risks inherent in exploring, producing and developing oil and gas properties." (Aff. of Grace Lee, Ex. A at 19.)

The plaintiffs do not deny that they are sophisticated investors. Rather, the complaint alleges that the defendants' representations were inconsistent with industry standards with which someone experienced in the oil and gas business would be familiar. (*See* Am. Compl. ¶¶ 63–64 (alleging that the allegedly misleading statements violated SEC and Petroleum Resources Management System standards)). As discussed above, the plaintiffs assert that they were misled by the defendants' misrepresentations because of the fact that the impact of plant shrink was accounted for in filings with the SEC and there was no disclosure alerting them to the fact that it was not accounted for in the estimates and projections provided by the defendants upon which they relied.

Given the fact-sensitive nature of the inquiry regarding whether a sophisticated investor's reliance is justifiable, drawing inferences in the light most favorable to the plaintiffs, the allegations in the complaint support a conclusion that the plaintiffs' sophistication does not preclude justifiable reliance on the alleged misrepresentations.

### (iii) PSLRA Safe Harbor

 The defendants argue that the allegedly misleading statements are protected under the PSLRA safe harbor provision because they are identified as being forward-looking and accompanied by meaningful cautionary language and were made without "actual knowledge" that they were false. The PSLRA provides that a defendant will

not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that (A) the forward looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (B) the plaintiff fails to prove that the forward-looking statement ... (ii) if made by a business entity, was (I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c). However, statements are not forward-looking where "they either state a present or historical fact alone or incorporate forward-looking aspects into statements of present or historical fact." *Sgalambo v. McKenzie,* 739 F.Supp.2d 453, 478 (S.D.N.Y.2010).

The complaint contains allegations that the defendants made misleading statements regarding the historical productivity of wells in the area where the Participation Wells would be located, thus causing the analysis performed on behalf of the plaintiffs to be based on faulty data. It also contains allegations that the defendants provided misleading projections for the future profitability of the Participation Wells based on historical data that they knew, or should have known, understated the expenses associated with methane production from SandRidge's wells. The PSLRA safe harbor does not apply either type of statement.

The complaint alleges that the defendants repeatedly stated that the rate of return for wells in the Warwick reservoir was 26% and that "SandRidge had increased its average reserves of raw/wet gas per well from an originally estimated 5.0 Bcfe (proved, undeveloped) to 7.0 Bcfe per well by mid–2008, and to 7.5 Bcfe per well by the end of 2008." (Am. Compl. ¶ 59.) These are statements of present or historical fact and therefore not protected by the safe harbor provision.

The complaint also alleges that the defendants provided projected rates of return, cash flows and net present value for the Participation Wells that were based on historical performance data that failed to take into account plant shrink. For example, the defendants calculated a net present value of $303,431 for the investment in the Participation Wells. This number was premised on the assertion that SandRidge had increased the average reserves of raw gas in its wells to 7.5 Bcfe by the end of 2008. The complaint alleges that using 7.5 Bcfe is misleading because it does not take into account the impact of plant shrink. The complaint further alleges that the plaintiffs' third party consultant, Ancell Energy, estimates that if plant shrink had been taken into account the plaintiffs' investment in the Participation Wells would have been reflected as having a net present value of negative $586,543. "Statements reporting test [or performance] results from the wells and predicting future well performance based on those results incorporate forward-looking aspects into statements of present fact," and are therefore not protected by the safe harbor provision. *Sgalambo,* 739 F.Supp.2d at 478.

██ Assuming *arguendo* that the complaint alleges that forward-looking statements were false or misleading, those statements would still not be entitled to the protection of the safe harbor provision. A forward-looking statement is protected under the PSLRA where it is accompanied by meaningful cautionary language or where the plaintiff fails to show that it was made with the approval of an officer who

had knowledge that the statement was false or misleading.

■ As to the first point, "[t]he defendants ... carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor." *Slayton*, 604 F.3d at 773. "The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." *Id.* at 771 (quoting Conference Report at 43, 1995 U.S.C.C.A.N. at 742). "[B]oilerplate warnings will not suffice." *Id.* "While the Conference Committee expected that 'cautionary statements identify important factors that could cause results to differ materially,' it did not expect them to identify all factors." *Id.* "[T]he use of the words 'meaningful' and 'important factors' are intended to provide a standard for the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss, without examining the state of mind of the defendant." *Id.*

The defendants identify disclaimers included in the March 3rd and March 16th presentations as being cautionary statements sufficient to make the statements protected by the safe harbor provision. These disclaimers stated that the presentations included forward-looking statements and that "actual results or developments may differ materially from those projected in the forward-looking statements." (Aff. of Grace Lee, Ex. B at 2.) The disclaimers specifically identified risk factors such as "the volatility of natural gas and oil prices, our success in discovering, estimating, developing and replacing natural gas and oil reserves" and others that might materially impact SandRidge's ability to meet projections. (*Id.*)

The disclaimers did not, however, refer to plant shrink, which the plaintiffs allege was a known and significant factor that affected SandRidge's ability to meet projections. The disclaimers also fail to identify any risks specific to investment in the Participation Wells or wells in the Warwick reservoir generally. Thus, while the disclaimers that were included mention a number of general factors that may affect anyone in the oil and gas business, such as changes in the regulatory environment, they do not provide company-specific information or link specific risks to specific factors that could cause results to differ materially from those projected in the forward-looking statements so as to make the cautionary statements more than boilerplate warnings. *See Sgalambo*, 739 F.Supp.2d at 478–79 ("Though this disclaimer mentioned myriad, general factors—such as natural gas prices or environmental hazards—that might cause actual results to differ from [the] projections, the disclaimer provided no company-specific information, failed to link any specific projections to specific risks, and remained constant throughout the Class Period, even as the risks confronting [the defendant] changed.").

■ The defendants also argue that the complaint has "no particularized facts showing that any defendant made any forward-looking statement with actual knowledge of its falsity." (Def. Mem. 29.) If a plaintiff fails to show that the forward-looking statements were made or approved by an officer of the business who had actual knowledge that the statements were false or misleading, then the statements are protected by the safe harbor provision.

However, the complaint specifically attributes many of the alleged misrepresentations to defendants Ward and Johnson, SandRidge's chief executive officer and

executive vice president, respectively. The statement that the rate of return for wells in the Warwick reservoir is 26% is alleged to have been made by each of Ward and Johnson. Ward gave a presentation in which he stated that calculations with respect to the agreement with Occidental assumed that the gas stream contained 65% $CO_2$ and 35% methane. Johnson displayed a slide which stated that the estimated proved undeveloped reserves had been increased from 5 to 7.5 Bcfe by year-end 2008. Johnson also used an economic assumption that the methane content of the raw gas extracted from wellheads was 44.81%, and that assumption was used in calculating the 26% rate of return. The plaintiffs allege that each of these statements does not take into account the impact of plant shrink. Thus, the facts alleged in the complaint support an inference that officers of SandRidge approved or made the allegedly misleading statements with actual knowledge of their falsity.

Because the complaint alleges facts that support the inference that the statements at issue were not forward-looking statements for the purposes of the PLSRA safe harbor provision, and, that even if they were, they were not accompanied by meaningful cautionary language and they were approved or made by an officer of SandRidge who had actual knowledge that they were false or misleading, the alleged misrepresentations by the defendants are not protected by the PSLRA safe harbor provision.

### (iv) Puffery or Otherwise Non–Actionable Statements

 The defendants contend that the plaintiffs could not have justifiably relied on the alleged misrepresentations because they were either puffery or made after the date the Participation Agreement was executed.

The defendants argue that the statement that wells in the Warwick reservoir had "one of the best ROR [rates of return] in America" is "in all relevant respects identical to those that the Second Circuit 'has repeatedly held to be nonactionable expressions of corporate optimism.'" (Def. Mem. 22.) "[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174. "The hallmark of such statements is that they are not capable of objective verification." *In re Tower Auto. Sec. Litig.*, 483 F.Supp.2d 327, 336 (S.D.N.Y. 2007).

The defendants repeatedly stated that wells in the Warwick reservoir had a rate of return of 26% and compared the Warwick reservoir favorably with other reservoirs in the United States. Financial calculations, such as a rate of return, are subject to objective verification. Given the appropriate data, all of which was available to the defendants, a third party could calculate the rate of return for wells in the Warwick reservoir and determine first, whether it was 26%, and second, whether that is one of the best rates of return in the country. Therefore, the statement identified by the defendants is not inactionable puffery.

The defendants argue that the plaintiffs could not have justifiably relied on statements made after the Participation Agreement was signed and that therefore statements made after May 5, 2009 are inactionable. However, the plaintiffs allege that "in reliance on SandRidge's continuing misrepresentations and omissions" they continued to send money to SandRidge through October 29, 2009, at which point they had paid $13.5 million of the first $15 million tranche. (Am. Compl. ¶ 98.) In other words, but for the defendants' continuing misrepresentations in September regarding the rate of return

for wells in the Warwick reservoir as compared to other reservoirs in the United States, the plaintiffs would not have sent the additional $3.5 million in October. The complaint also alleges that once the plaintiffs became aware of the alleged fraud they stopped making payments, even though the entire $15 million first tranche had not been funded. Thus, the complaint alleges that the plaintiffs relied on misrepresentations made through October 29, 2009. However, the statements made by defendant Ward on November 6, 2009 could not have been justifiably relied upon by the plaintiffs and cannot serve as the basis for a fraud claim.

### c. Loss Causation

The defendants argue that the plaintiffs have failed to plead loss causation because the plaintiffs do not plead facts showing that any alleged misrepresentation actually caused the plaintiffs' loss, as opposed to intervening factors such as the low level of gas in the wells and the depressed prices for natural gas.

■■■■■ "Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir.2005) (quoting *Emergent Capital*, 343 F.3d at 197). Loss causation is akin to the tort-law concept of proximate cause. *See id.* "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Id.* at 173 (emphasis in original). "Thus to establish loss causation, 'a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Id.* (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001)) (emphasis in

original). The alleged misconduct "must be a 'substantial factor in the sequence of responsible causation'" but does not need to be the sole cause of the loss. *Gould v. Winstar Comm'ns, Inc.*, 692 F.3d 148, 161 (2d Cir.2012) (quoting *AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202, 215 (2d Cir.2000)). If the plaintiff has alleged facts from which "a jury could reasonably infer ... that the [injury] was attributable in part to the alleged fraud" then loss causation cannot be determined on a motion to dismiss. *Id.*

■■■■ The defendants argue that the complaint attributes the plaintiffs' loss to "depressed prices for natural gas" and the low level of gas in the wells. As to the low level of gas in the wells, the complaint does cite lower than expected production of natural gas as a cause of the plaintiffs' loss. The complaint alleges, however, that the reason that there has been lower than expected production is that the estimates and projections provided by the defendants did not include adjustments that should have been made for methane lost during the refinement process, i.e., plant shrink. Therefore, the allegations on which the defendants base their argument that the plaintiffs have pled as an intervening cause of their loss the fact that there has been a low level of gas in the wells does not support their argument, but rather, is entirely consistent with the plaintiffs' theory of causation.

The plaintiffs do allege that the "high content of waste $CO_2$ gas ... *combined with* the depressed prices for natural gas" caused their loss. (Am. Compl. ¶ 8 (emphasis added).) However, where "an intervening event, like a general fall in the price" of the commodity is asserted as a defense to establishing loss causation, it "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital*, 343 F.3d at 197;

*see also Gould,* 692 F.3d at 161; *Lentell,* 396 F.3d at 174.

Therefore, the court concludes that the plaintiffs have adequately pled a causal link between the alleged fraud and the loss suffered.

#### d. Pleading with Particularity

The defendants argue that the plaintiffs have failed to satisfy the heightened pleading standard under Fed.R.Civ.P. 9(b) because the plaintiffs fail to adequately identify the specific statements that each defendant is alleged to have made.[2]

The complaint specifically attributes statements to defendant SandRidge, including documents uploaded to a file sharing site made available to USDCM and Patriot on March 16, 2009; these included a PowerPoint presentation with multiple slides containing alleged material misstatements and omissions regarding historical well performance data. The complaint specifically attributes statements to defendant Ward, including an e-mail dated January 21, 2009 that stated that "the Pinon Field Warwick Thrust has one of the best ROR in America." (Am. Compl. ¶ 69.) (*See also id.* at ¶¶ 41, 69, 70, 84, 94.) The complaint specifically attributes statements to defendant Johnson, including statements made during a PowerPoint presentation on March 3, 2009 that "the rate of return for Warwick was 26%, the highest of the five gas producing properties compared on the slide" (*id.* at ¶ 72), and "that SandRidge and/or its consultants had raised the estimated proved undeveloped reserves from 5.0 Bcfe to 7.0 Bcfe, and to 7.5 Bcfe by the end of 2008" (*id.* at ¶ 71). (*See also id.* at ¶¶ 72, 74–78).

 The complaint does not attribute any allegedly false or misleading statements directly to defendant Matthew Grubb. " 'The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified in the complaint.' " *Schnall v. Annuity and Life Re (Holdings), Ltd.,* No. 3:02CV2133(GLG), 2004 WL 515150, at *4 (D.Conn. Mar. 9, 2004) (quoting *Elliott Assocs., L.P. v. Covance, Inc.,* No. 00cv4115, 2000 WL 1752848, at *12 (S.D.N.Y. Nov. 28, 2000)). "Thus, a member of upper level management, such as the CEO or CFO, who had knowledge of the fraud, and assisted in its perpetration by failing to disclose or correct the fraud when he had a duty to do so, may be held liable under § 10(b) and Rule 10b–5." *Id.* This doctrine is limited to instances where there were "group-published documents, such as SEC filings and press releases" and where "the officers or directors of the company 'participated in the preparation and dissemination' of the group published document." *Id.* (quoting *Degulis v. LXR Biotech., Inc.,* 928 F.Supp. 1301, 1311–12 (S.D.N.Y.1996)). This doctrine creates a presumption that group-published information is "the collective work of those individuals with direct involvement in the everyday business of the company." *In re Pfizer Inc. Sec. Litig.,* 584 F.Supp.2d 621, 637 (S.D.N.Y.2008).

 Defendant Grubb is, and was at the time of negotiations with the plaintiffs, Chief Operating Officer of SandRidge. The complaint alleges that defendant Grubb discussed with the plaintiffs the possibility of their investing in SandRidge's natural gas drilling program.

---

**2.** In support of this argument, the defendants make the point that "[d]efendants Grubb, Dobson, Gilliland, Jordan, Oliver, and Serota appear virtually nowhere else in the Amended Complaint other than where they are introduced as parties and when specified as defendants in the causes of action." (Def. Mem. 31.) However, defendants Dobson, Gilliland, Jordan, Oliver and Serota are not named as defendants in the First Cause of Action.

The complaint relies on a number of alleged misstatements made during a series of investor presentations beginning in January, 2009. Drawing inferences in the light most favorable to the plaintiffs, the allegations in the complaint could support a conclusion that defendant Grubb, an upper level officer involved in discussions with the plaintiffs regarding investing in SandRidge, knew of the alleged misstatements and omissions and failed to disclose or correct the fraud.

Therefore, the court concludes that the plaintiffs have satisfied the pleading standard under Fed.R.Civ.P. 9(b).

### 2. Section 20(a)

The defendants argue that the Seventh Cause of Action, which alleges control person liability under Section 20(a) of the Exchange Act against the eight individual defendants, must be dismissed because there was no primary Rule 10(b) violation and because the plaintiffs fail to allege any culpable conduct on the part of the individual defendants. For the reasons discussed above, the court is not granting the motion to dismiss the federal Rule 10(b) claim. Therefore, the absence of a primary violation is not a basis for dismissing the Seventh Cause of Action.

■■■■ As to the defendants' second argument,

[c]ontrol for the purposes of Section 20(a) may be established by showing that each individual defendant "possessed 'the power to direct or cause the direction of the management and policies'" of [the entity]. "'A person's status as an officer, director, or shareholder, absent more, is not enough to trigger liability under § 20.'" To survive a motion to dismiss under 20(a), a plaintiff need only "plead facts which 'support a reasonable inference that [defendants] had the potential power to influence and direct the activities of the primary violator.'"

*In re Adelphia Commc'n Corp. Sec. & Derivative Litig.*, 398 F.Supp.2d 244, 262 (S.D.N.Y.2005) (internal citations omitted) (alterations in original). "A court 'must consider the total effect of the various indicia of control in combination,' rather than examining any one indicia in isolation." *Id.* (quoting *In re Leslie Fay Cos., Inc. Sec. Litig.*, 918 F.Supp. 749, 763 (S.D.N.Y.1996)). "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *CompuDyne Corp. v. Shane*, 453 F.Supp.2d 807, 829 (S.D.N.Y.2006).

■■■■ The complaint alleges that defendants Ward and Grubb communicated with the plaintiffs regarding the possibility of investing in SandRidge's natural gas drilling program. Defendant Ward was SandRidge's Chief Executive Officer and defendant Grubb was its Chief Operating Officer. The complaint alleges that defendants Ward and Johnson participated in investor presentations in which a number of allegedly misleading statements were made. Defendant Johnson was Executive Vice President of Reservoir Engineering. The allegations in the complaint could support a conclusion that each of defendants Ward, Grubb and Johnson was an upper level officer who had the potential power to influence and direct the activities of SandRidge, and that he was therefore a control person within the meaning of Section 20(a).

■■■■ With respect to defendants Dobson, Gilliland, Jordan, Oliver and Serota, however, the complaint merely recites that they are directors of the company and states that they signed the annual 10–K report. These facts could not establish control person liability. Therefore, the motion to dismiss is being granted with

respect to defendants Dobson, Gilliland, Jordan, Oliver and Serota as to the Seventh Cause of Action.

## C. Connecticut Uniform Securities Act Claims

The plaintiffs bring claims pursuant to the Connecticut Uniform Securities Act for violation of Conn. Gen.Stat. §§ 36b–4 and 36b–29(a) (Second Cause of Action) and Conn. Gen.Stat. § 36b–29(c) (Fifth, Eighth and Tenth Causes of Action).

As to the Second Cause of Action, Conn. Gen.Stat. § 36b–29(a) provides that:

> Any person who: ... (2) offers or sells or materially assists any person who offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, who knew or in the exercise of reasonable care should have known of the untruth or omission, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security.

The defendants make the same arguments as to the Second Cause of Action that they made with respect to the federal Rule 10(b) claim. Thus, for the reasons discussed above, the motion to dismiss is being denied as to the Second Cause of Action.

The plaintiffs allege that each of the individual defendants are officers or directors (Fifth Cause of Action) and directly or indirectly controlled SandRidge (Eighth Cause of Action), and that defendants Ward, Grubb and Johnson materially aided in the allegedly fraudulent act or transaction (Tenth Cause of Action). Conn. Gen.Stat. § 36b–29(c) provides that:

> Every person who directly or indirectly controls a person liable under subsection (a) and (b) of this section, every partner, officer or director of such a person who materially aids in the act or transaction constituting the violation and every broker-dealer or agent who materially aids in the act or transaction constituting the violation are also liable jointly and severally to the same extent as such person, unless the person who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

Because the complaint alleges that each of the individual defendants is an officer or director of SandRidge, the motion to dismiss is being denied as to the Fifth Cause of Action. The motion to dismiss is being granted with respect to defendants Dobson, Gilliland, Jordan, Oliver and Serota as to the Eighth Cause of Action for the reasons discussed above with respect to federal Section 20(a) claim. The motion to dismiss is being denied with respect to defendants Ward, Grubb and Johnson as to the Eighth and Tenth Causes of Action for the reasons discussed above with respect to federal Section 20(a) claim.

## D. Oklahoma Uniform Securities Act

The plaintiffs bring claims pursuant to the Oklahoma Uniform Securities Act for violation of 71 Okl. St. Ann. § 1–509(B) (Third Cause of Action) and 71 Okl. St. Ann. § 1–509(G) (Sixth, Ninth and Eleventh Causes of Action).

As to the Third Cause of Action, the Oklahoma Uniform Securities Act, 71 Okl. St. Ann. § 1–509(B), provides that:

> A person is liable to a purchaser if the person sells a security ... by means of

an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading, the purchaser not knowing the untruth or omission, and the seller not sustaining the burden of proof that the seller did not know and, in the exercise of reasonable care, could not have known of the untruth or omission.

The defendants make the same arguments as to the Third Cause of Action that they made with respect to the federal Rule 10(b) claim. Thus, for the reasons discussed above, the motion to dismiss is being denied as to the Third Cause of Action.

The plaintiffs allege that the individual defendants are officers or directors (Sixth Cause of Action), directly or indirectly controlled SandRidge (Ninth Cause of Action) and materially aided in the allegedly fraudulent act or transaction (Eleventh Cause of Action). Oklahoma Uniform Securities Act, 71 Okl. St. Ann. § 1-509(G)(2), provides that liability extends to:

1. A person that directly or indirectly controls a person liable under subsections B through F of this section, unless the controlling person sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the conduct by reason of which the liability is alleged to exist;

2. An individual who is a managing partner, executive officer, or director of a person liable under subsections B through F of this section ... unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of the con-

duct by reason of which the liability is alleged to exist.

. . .

5. Any other person who materially aids in the conduct giving rise to the liability under subsections B through F of this section, unless that person did not know and, in the exercise of reasonable care could not have known, of the existence of the conduct by reason of which liability is alleged to exist.

Because the complaint alleges that each of the individual defendants is an officer or director of SandRidge, the motion to dismiss is being denied as to the Sixth Cause of Action. The motion to dismiss is being granted with respect to defendants Dobson, Gilliland, Jordan, Oliver and Serota as to the Ninth and Eleventh Causes of Action for the reasons discussed above with respect to the federal Section 20(a) claim. The motion to dismiss is being denied with respect to defendants Ward, Grubb and Johnson as to the Ninth and Eleventh Causes of Action for the reasons discussed above with respect to the federal Section 20(a) claim.

### E. Common Law Claims for Fraud, Aiding and Abetting and Negligent Misrepresentation

The plaintiffs bring claims for common law fraud (Fourth Cause of Action), aiding and abetting (Twelfth Cause of Action) and negligent misrepresentation (Thirteenth Cause of Action).

As to the Fourth Cause of Action, under Connecticut law:

Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right and which accomplishes the end designed .... The elements of a fraud action are: (1) a false representation

was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. *Master–Halco, Inc. v. Scillia Dowling & Natarelli, LLC,* 739 F.Supp.2d 109, 114 (D.Conn.2010) (quoting *Weinstein v. Weinstein,* 275 Conn. 671, 685, 882 A.2d 53 (2005)). The defendants make the same arguments that they make with respect to the federal Rule 10(b) claim. Thus, for the reasons discussed above, the motion to dismiss is being denied as to the Fourth Cause of Action.

 As to the Twelfth Cause of Action, under Connecticut law:

> With respect to aiding and abetting common law fraud, a plaintiff must allege with particularity that: (1) the party aided by the defendant performed a wrongful act; (2) the defendant generally was aware of his role as part of an illegal or tortious activity at the time he provided the assistance; and (3) the defendant knowingly and substantially assisted the principal violation.

*In re Colonial Ltd. P'ship Litig.,* 854 F.Supp. 64, 102–03 (D.Conn.1994). The defendants argue that the plaintiffs have not met their burden of alleging (i) an underlying fraud, (ii) that the individual defendants were aware of their role as part of an overall illegal or tortious activity, or (iii) that the individual defendants knowingly and substantially assisted the principal violation. The defendants' first argument fails because, for the reasons discussed above, the court finds that the plaintiffs have stated a fraud claim.

 The plaintiffs allege that defendants Ward and Grubb both communicated with them regarding investing in the Participation Wells. The plaintiffs allege that defendants Ward and Johnson were both involved in investor presentations during which the allegedly fraudulent statements were made. Drawing inferences in the plaintiffs' favor, these allegations support a conclusion that defendants Ward, Grubb and Johnson were each involved in aiding or abetting the underlying fraud.

 As to defendants Dobson, Gilliland, Jordan, Oliver and Serota, the complaint merely alleges that they are directors of the company and that they signed the annual 10–K filing. These allegations could not support a conclusion that they were aware of illegal or tortious activity or that they knowingly and substantially assisted the principal violation. Therefore, the motion to dismiss is being granted with respect to Dobson, Gilliland, Jordan, Oliver and Serota as to the Twelfth Cause of Action.

 As to the Thirteenth Cause of Action, "[t]o prove a claim for negligent misrepresentation under Connecticut law, a plaintiff must demonstrate that the defendant 'knew or should have known that [a representation] was false, that the plaintiff reasonably relied upon the misrepresentation, and that the plaintiff [ ] suffered pecuniary harm as a result thereof.'" *Flemming v. Goodwill Mortg. Servs., LLC,* 648 F.Supp.2d 292, 295 (D.Conn.2009) (quoting *Glazer v. Dress Barn, Inc.,* 274 Conn. 33, 73, 873 A.2d 929 (2005)). The defendants argue that the plaintiffs have failed to allege facts that could show reasonable reliance or show that that they suffered pecuniary harm as a result. For the reasons discussed above with respect to the federal Rule 10(b) claim, the motion to dismiss the Thirteenth Cause of Action is being denied.

## F. Texas Securities Act

The plaintiffs bring claims pursuant to the Texas Securities Act, Tex. Civ. Stat.

Art. 581–33 (Fourteenth, Fifteenth and Sixteenth Causes of Action).

A person who offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him.

Tex. Civ. Stat. Art. 581–33(A)(2). The defendants make the same arguments as to the Fourteenth Cause of Action that they made with respect to the federal Rule 10(b) claim. Thus, for the reasons discussed above, the motion to dismiss is being denied as to the Fourteenth Cause of Action.

As to the Fifteenth Cause of Action, the plaintiffs allege that each of the individual defendants is liable as a control person under Tex. Civ. Stat. Art. 581–33(F)(1). The motion to dismiss is being granted as to the Fifteenth Cause of Action with respect to defendants Dobson, Gilliland, Jordan, Oliver and Serota because the complaint fails to allege facts that could support the conclusion that these defendants directly or indirectly controlled SandRidge. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 567 (S.D.Tex.2002) ("Status alone is insufficient to establish that the defendant is a control person within the ambit of the statute.") The motion to dismiss is being denied with respect to defendants Ward, Grubb and Johnson as to the Fifteenth Cause of Action for the reasons discussed above with respect to the federal Section 20(a) claim.

As to the Sixteenth Cause of Action, the plaintiffs allege that each of the individual defendants is liable for having aided or abetted in the commission of the alleged securities violation under Tex. Civ. Stat. Art. 581–33(F)(2). The motion to dismiss is being granted as to the Sixteenth Cause of Action with respect to defendants Dobson, Gilliland, Jordan, Oliver and Serota because the complaint fails to allege facts that could support the conclusion that these defendants aided or abetted the alleged fraud. The motion to dismiss is being denied with respect to defendants Ward, Grubb and Johnson as to the Sixteenth Cause of Action for the reasons discussed above with respect to the federal Section 20(a) claim.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (Doc. No. 33) is hereby GRANTED in part and DENIED in part. With respect to defendants Dobson, Gilliland, Jordan, Oliver and Serota, the Seventh, Eighth, Ninth, Eleventh, Twelfth, Fifteenth and Sixteenth Causes of Action are being dismissed. The remaining claims are:

• With respect to SandRidge Energy, the First, Second, Third, Fourth, Thirteenth and Fourteenth Causes of Action;

• With respect to SandRidge Exploration and Production, LLC, the First, Second, Third, Fourth and Fourteenth Causes of Action;

• With respect to Ward, Grubb and Johnson, the First through Sixteenth Causes of Action; and

• With respect to Dobson, Gilliland, Jordan, Oliver and Serota, the Fifth and Sixth Causes of Action. It is so ordered.